IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEITH ALBRIGHT

            *Plaintiff.*

    v.

THE TRUSTEES OF THE UNIVERSITY
OF PENNSYLVANIA et al.,

            *Defendants.*

CIVIL ACTION
NO. 19-00149

PAPPERT, J.                                                  **October 18, 2019**

## MEMORANDUM

      Keith Albright was fired from his job as a clinical audiologist after showing up late to work sixty times in a span of two years.  He claims that his clinical depression and anxiety disorders caused him to oversleep.  Albright filed this lawsuit against his supervisor, Sherrie Davis, and his employer, the Trustees of the University of Pennsylvania ("University"), arguing that Defendants discriminated and retaliated against him under the Americans with Disabilities Act ("ADA"), Pennsylvania Human Relations Act ("PHRA") and Philadelphia Fair Practices Ordinance ("PFPO"); failed to provide him with reasonable accommodations under the ADA; interfered with his Family and Medical Leave Act ("FMLA") benefits; and retaliated against him for taking FMLA leave.  Davis and the University filed a Motion for Summary Judgment which the Court, after considering all of the briefing, thoroughly reviewing the record and holding oral argument, grants in full.

I

Albright was a clinical audiologist who was hired by the University in 2013. (Offer Letter, Ex. B, ECF No. 20-3.)  He saw patients in a clinical setting where he conducted hearing tests and fitted hearing aids.  (Compl. ¶16, ECF No. 1.)  From 2013 to 2016, Albright worked five days a week from 8:00 AM–4:30 PM, splitting his time between the audiology department's University City (Philadelphia) and Radnor, Pennsylvania locations.  (Albright Dep. 31:8–17; ECF No. 20-3.)  By all accounts, Albright was a skilled audiologist and he received accolades for his performance, particularly as it related to patient-care satisfaction.  *See* (Emp. Recognition Email, Ex. B, ECF No. 23-2; Performance Evaluation, Ex. K, ECF No. 20-1).

In 2016, Albright started showing up late to work without informing Davis in advance.  *See* (Albright Dep. 75:7–10; Attendance Log, Ex. G, ECF No. 20-3.)  According to Davis, the department-wide policy required employees to text her by 7:00 AM anytime they were running late or had a last-minute unscheduled absence.  (Davis Dep. 48:5–21, ECF No. 20-3.)  In 2016 alone, Albright accumulated twenty-three unexcused late arrivals.  (Attendance Log, Ex. G, at 187–88.[1])  Albright would often text Davis to explain his tardiness.  For example, on September 23, 2016, he texted Davis at 8:08 AM: "I'm on way but going to be past the 10 minutes [grace period], had [yoga] class this morning."  (Albright-Davis Text Messages, Ex. F, at 157, ECF No. 20-3.)  On September 29, 2016, Albright was late again, this time texting Davis at 8:04 AM: "I forgot my phone so had to turn back to get it.  See you 815."  (*Id.*)  Additional texts offer

---

[1]      The citations to exhibits reflect ECF pagination rather than the individual exhibits' internal pagination.

a slew of reasons to explain Albright's tardiness, including facing traffic delays, waiting for stalled buses, having to pull his car over because he felt ill, getting lost in the hospital's surgery center, and grabbing coffee before coming up to the clinic. *See* (*id.* at 157–66).

Davis met with Albright in the fall of 2016—without the intervention of human resources ("HR") personnel—to discuss his tardiness and consider solutions to the problem. (Davis Dep. 42:7–43:6.) Albright asked to modify his start time to 8:30 AM and to work exclusively at the University City location. (*Id.*) Davis granted these requests and implemented them in January of 2017. (*Id.* 50:8–52:5.) Davis also suggested that Albright take advantage of the University's Employee Assistance Plan ("EAP"), which he did. (Albright Dep. 79:14–23.) Albright was granted eight EAP counseling sessions with Diane Hunt, a licensed professional counselor, which began on September 20, 2016. (EAP Intake Form, Ex. D, ECF No. 23-2.) Hunt's notes from the sessions indicate that Albright was "feeling physical manifestation[s] of stress" and experiencing sleep deprivation. (*Id.*) Albright met with Hunt again on October 25, 2016, September 7, 2017, and September 21, 2017. (*Id.*)

In 2017, even with the adjusted schedule in place, Albright continued to arrive late. (Attendance Log, Ex G., at 189–90.) On January 3, 2017, he texted Davis at 9:02 AM: "I am running late, am 5 min away. I got up super early to be there before my new shift—dressed and ate breakfast, then sat down on my couch watching the news which I never do and must have dozed off." (*Id.* at 168.) Then on January 11, 2017, Albright texted Davis that he was running late because of a delayed train, and on January 26, February 2, and February 24, Albright blamed traffic jams for his tardiness. (*Id.* at

169–70; 175.)  According to Albright, he told Davis that the modified schedule was not working but admits that he never specifically asked for a different start time or other changes. (Albright Dep. 148:11–18.)

On January 18, 2017, Albright visited a nurse practitioner ("NP").  (Patient Progress Note, Jan. 18, 2017, Ex. E, ECF No. 23-2.)  The NP's medical notes indicate that Albright felt depressed and had difficulties falling asleep and waking up.  (*Id.*)  Albright also scored a PHQ-9 on a depression screening scale, which the NP interpreted as mild depression.  (*Id.*)  According to Albright, he never expressly told Davis that he suffered from depression; instead, he testified that in early 2017 he told her about feeling stressed and having suicidal thoughts.  (Albright Dep. 111:16–24.)  He called his condition a "problem," an "event," and "being discombobulated."  (Davis Dep. 167:14–17; 170:3–4.)  Albright also claims that he experienced anxiety attacks at work, (Albright Dep. 127:9–12), but Davis stated she was not aware of them.  (Davis Dep. 41:7–13.)  Davis testified that she asked Albright multiple times if he had a medical issue precluding him from getting to work on time, but he always answered "no."  (Davis Dep. 54:7–15.)  However, Davis was concerned that something was amiss, because Albright was shaky at work and had been falling asleep during shifts.  (Davis Dep. 119:3–8.)

Albright's chronic tardiness and failure to abide by the call-out policy prompted Davis to email the University's HR department on March 29, 2017 to initiate a formal performance improvement plan.[2]  (March 29, 2017 Email, Ex. H, ECF No. 20-3.)  The University's performance improvement plan proceeds as follows: Coaching, First

---

[2]      On that same day, Albright arrived late to work after texting Davis at 9:19 AM: "I am so sorry but apparently my alarm did not go off."  (Albright-Davis Text Messages, Ex. F, at 178.)

Written Warning, Second Written Warning, Final Written Warning, and Termination. (Performance Improvement and Progress Steps Policy, Ex. C, P-5, ECF No. 20-3.)

Davis issued a Coaching—the first step in the performance improvement plan—to Albright on April 6, 2017 for his "excessive lateness." (Albright Dep. 82:1–17; Coaching, Ex. C, P-7, ECF No. 20-3.) On July 10, 2017, Davis issued a First Written Warning because Albright arrived more than three hours late on June 30, 2017 without abiding by the call-out policy. (Albright Dep. 98:8–99:2; First Written Warning, Ex. C, P-9, ECF No. 20-3.) After the First Written Warning, Davis suggested that Albright consider applying for FMLA leave. (Davis Dep. 134:7–11.)

The Second Written Warning was issued on Aug. 10, 2017 because Albright arrived to work approximately two hours late without notifying Davis in advance. (Albright Dep. 107:19–108:10; Second Written Warning, Ex. C, P-11, ECF No. 20-3.) Albright received his Final Written Warning on September 7, 2017 for late arrivals on August 18, 2017 and September 1, 2017. (Albright Dep. 115:18–116:19; Final Written Warning, Ex. C, P-14, ECF No. 20-3.) By the time Albright received his Final Written Warning, he had begun paperwork for FMLA leave but had not yet submitted it. (Albright Dep. 116:20–24.)

Shortly after receiving the Final Written Warning, Albright had a follow-up appointment with his NP, who noted that Albright's anxiety was "deteriorating," but he declined to start anxiety medication that day. (Patient Progress Note, Sept. 15, 2017, Ex. E, ECF No. 23-2.) Four days later, on September 19, 2017, EAP counselor Hunt sent the University's Department of Disability Management a medical certification in support of the Albright's FMLA leave. (FMLA Certification of Healthcare Provider, Ex.

C, P-11, ECF No. 20-3.)  Hunt wrote that Albright's medical diagnosis was "F41.1" (generalized anxiety disorder) and she recommended a psychiatric evaluation and assessment for medication.  (*Id*.)

The University approved Albright's intermittent FMLA leave on September 25, 2017, allowing him two, three-hour absences per week.  (FMLA Approval Letter, Ex. C, P-15, ECF No. 20-3.)  The approval letter stated that Albright was "expected to follow the regular call-out procedures for [his] department," and when calling out, "to make clear that the time off" was for FMLA.  (*Id*.)  Yet Albright recalls that when he met with an HR employee, he was told he only needed to tell Davis he was using FMLA, "because [his disability] would not allow [him] to call in" before 7:00 AM.  (Albright Dep. 118:18–25.)

Albright first attempted to use FMLA leave on September 26, 2017.  At 8:49 AM, Davis texted Albright: "Are you on your way? Your patient is waiting."  (Albright-Davis Text Messages, Ex. G, at 183.)  Davis responded: "I'm using [FMLA] this morning." (*Id*.)  Once Albright arrived at work at 9:40 AM, Davis told him that he still needed to comply with the 7:00 AM call-out policy, even when using FMLA leave.  Albright followed up with HR later that day to confirm whether he had to comply with the 7:00 AM call-out procedure; HR told Albright he could still be held accountable for failing to follow his department's policy.  (Sept. 26, 2017 Email, Ex. C, P-16, ECF No. 20-3.)  No formal employment action was taken for Albright's late arrival that day; rather, the University applied his FMLA leave retroactively.  Later that day, Davis also sent a department-wide email reminding employees to text her by 7:00 AM if they would be late or absent from work.  (Sept. 26, 2017 Email, Ex. I, ECF No. 20-3.)

On November 29, 2017, Albright once again arrived late to work—this time, at 11:28 AM—without informing Davis in advance. (Albright Dep. 124:15–125:4; Attendance Log, Ex. G, at 190.) He did not attempt to invoke FMLA leave that day. *See* (Albright Dep. 126:3–8). As a result, the University terminated Albright on December 6, 2017. (Termination Letter, Ex. C, P-17, ECF No. 20-3.)

II

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the plaintiff. *Id.* at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

When ruling on a motion for summary judgment, the Court may rely only on admissible evidence. *See, e.g., Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 94 (3d Cir. 1999). A court must view the facts and draw all reasonable inferences in favor of the nonmoving party. *See In re Flat glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004). "An inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

III

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). Albright alleges two theories of discrimination: disparate treatment and failure to provide reasonable accommodations.[3]

A

1

Discrimination claims based on allegations of indirect discrimination are analyzed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Albright must first establish a *prima facie* case of discrimination under the ADA. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 761 (3d Cir. 2004) (superseded by statute on different grounds). Once he does so, the burden shifts to the Defendants "to articulate some legitimate, nondiscriminatory reason for the [adverse action]." *McDonnell Douglas*, 411 U.S. at 802. "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the Defendants meet the "relatively light burden" of

---

[3]    The analysis of the ADA disparate treatment claim applies equally to the discrimination claims under the PHRA and PFPO. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (applying ADA analysis to PHRA discrimination claim); *Ahem v. Eresearch Tech., Inc.*, 183 F. Supp. 3d 663, 668 (E.D. Pa. 2016) (applying ADA analysis to PFPO discrimination claim).

articulating a legitimate, nondiscriminatory reason for the adverse action, the burden shifts back to the plaintiff to show that the employer's explanation is mere pretext. *Id.*

To establish a *prima facie* case of discrimination under the ADA, Albright must show that: (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) he suffered from an adverse employment action as a result of the discrimination. *Gaul v. Lucent Tech., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). The parties dispute all three elements of the *prima facie* claim.

2

To determine whether an individual is disabled under the ADA, the statute "shall be construed in favor of broad coverage of individuals . . . to the maximum extent" permitted by law. 42 U.S.C. § 12102(4)(A). A "disability" is defined by the ADA as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Id.* § 12102(1)(A)–(C). Albright's Complaint only alleges that his clinical depression and anxiety disorders constitute a physical or mental impairment that substantially limits a major life activity. (Compl. ¶ 12; Oct. 10, 2019 Hr'g Tr. 49:22–50:5.)

"[I]t is well-established that a particular diagnosis, no matter how severe (or severe-sounding to the layperson), standing alone, is not sufficient to establish 'disability.'" *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 513 n.5 (3d Cir. 2001). The disability must also substantially limit a major life activity. The ADA provides a nonexhaustive list of major life activities, including "caring for oneself, performing

9

manual tasks, seeing, hearing, eating, sleeping, walking . . . concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). EEOC regulations provide that an individual's impairment constitutes a disability if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). The inquiry as to whether an employee has a disability is made on a case-by-case basis. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999).

Depression is a mental impairment covered by the ADA. *See* 29 C.F.R. § 1630.2(j)(3)(iii). The NP's medical assessments of Albright seem to indicate some form of depression and/or anxiety disorder. On January 18, 2017, the NP recorded that Albright scored a PHQ-9 on a depression screening, which she interpreted as "mild depression." (Patient Progress Note, Jan. 18, 2017, Ex. E.) Eight months later during a follow-up appointment, the NP noted that Albright's anxiety was deteriorating but he declined to start medication that day. (Patient Progress Note, Sept. 17, 2017, Ex. E.) And five days after Albright's termination, the NP prescribed him medication for anxiety and depression. (Patient Progress Note, Dec. 11, 2017, Ex. N, ECF No. 20-3.)

Albright further contends that his depression and anxiety disorders "substantially limit[ed] one or more major life activities." 24 U.S.C. § 12102(1)(A). The ADA recognizes sleeping and brain functioning as major life activities. *Id.* § 12102(2)(A)–(B). Albright testified that the depression affected his "day-to-day sleep patterns" and his ability to hear his alarm clock go off. (Albright Dep. 59:8–60:21.) Reasonable jurors could find that his disability impacted his sleeping and brain activity more severely than as compared to an average member of the population. Albright

therefore has established a triable issue of fact as to whether he suffered from a disability, but his discrimination claim fails because he was not qualified to perform the essential functions of his job.

### 3

Under the ADA, a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). "To satisfy this requirement, a plaintiff must first demonstrate that [he] 'satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires.'" *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 278 (3d Cir. 2001) (citing *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 145 (3d Cir. 1998) (en banc)). "Second, a plaintiff must establish that [he], 'with or without reasonable accommodation, can perform the essential functions of the position held or sought.'" *Id.* The University does not contend that Albright lacked the requisite skill, experience and education to work as a clinical audiologist. *See* (Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem."), ECF No. 20, at 8–10). The only issue is whether Albright could perform the essential functions of his position with or without reasonable accommodation. (*Id.*)

EEOC regulations indicate that a job's "essential functions" are those that are "fundamental," not "marginal." 29 C.F.R. § 1630.2(n)(1). The regulations provide a nonexhaustive list of evidence that courts may consider when determining what constitutes an essential function of the employee's job, including: (1) the employer's judgment, (2) written job descriptions, (3) the amount of time performing the function, (4) the consequences of not performing the function, (5) the terms of a collective

bargaining agreement, (6) the work experience of past employees on the job, and (7) the current work experience of others on the job. *Id*. § 1630.2(n)(3); *see also Skerski*, 257 F.3d at 281 (referring to these factors).

The University contends that one essential function of Albright's position as a clinical audiologist is patient care, which includes showing up on time for scheduled appointments with patients. (Defs.' Mem. 9–10; Oct. 10, 2019 Hr'g Tr. 10:20–24.) Attendance and punctuality cases are unique, given that "the applicable [EEOC] factors do not shed much light on whether a regular and predicable schedule is an essential function of a [job]." *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 34 (1st Cir. 2000). A closer examination of Third Circuit decisions shows that whether predictable and punctual attendance constitutes an essential function of a position largely depends on the nature of the job itself.

The Third Circuit Court of Appeals' most recent published opinion addressing punctuality and attendance involved a marketing production manager who suffered from clinical depression. *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 321 (3d Cir. 2003). The supervisor became concerned with plaintiff's frequent tardiness and agreed to accommodate the plaintiff by allowing her to begin work at 8:30 AM rather than at 8:00 AM. *Id.* Plaintiff nonetheless continued to come to work late. *Id.* MBNA argued that punctuality was an essential function of the plaintiff's managerial position in order to "set an example by coming to work 'on time.'" *Id.* at 328. The Third Circuit disagreed, concluding that punctuality for the sake of setting a good example did not rise to the level of an essential function. *Id.* at 329. "Although there clearly may be

some situations where an employee's starting time cannot be altered because it is an essential function of the job," that was not the case in *Conneen*. *Id.*

However, other cases in this Circuit involving jobs similar to Albright's position—i.e., caring for patients in the healthcare industry—have concluded that regular and predictable on-site attendance is an essential function of the position. *See, e.g.*, *Miller v. Univ. of Pittsburgh Med. Ctr.*, 350 F. App'x 727, 729 (3d Cir. 2009) (unpublished) ("Given the nature of Miller's job, assisting during surgery performed in the hospital, we find it evident that attendance is an essential element of this position."); *Johnson v. Children's Hosp. of Phila.*, 1995 WL 338497, at *2 (E.D. Pa. June 5, 1995) (holding plaintiff could not perform essential functions of his position as an aide in the radiology department when he frequently showed up to work late), *aff'd*, 79 F.3d 1138 (3d Cir. 1996).

The facts of this case align more closely with those in *Miller* and *Johnson*. A clinical audiologist works in the healthcare industry and has direct patient contact. He must arrive to work predictably and promptly in order to care for scheduled patients. Albright admitted that maintaining appointments is a responsibility of a clinical audiologist:

> Q: Would patient care be one of your responsibilities as a Clinical Audiologist?
> A: Absolutely.
> Q: Would keeping and maintaining appointments with patients be a
> responsibility of a Clinical Audiologist?
> A: It would be.

(Albright Dep. 46:14–20.) Davis testified that there were "times that we had to send patients away after they sat for an hour, because [we] had no idea whether he was

coming or not coming." (Davis Dep. 50:22–60:2.) Moreover, other clinical audiologists had "their own patients, so people can't see two patients simultaneously." (*Id.* 59:16–19.)

Courts also consider factors including "the employer's judgment of the essential functions and a written description of the position" to determine what is an essential function. *Miller*, 350 F. App'x at 729 (citing *Deane*, 142 F.3d at 146). Albright's supervisor identified maintaining appointments and showing up on time as essential functions of the clinical audiologist position. (Davis Dep. 165:8–11.) And the position description provides that Albright's duties included "greet[ing] and attend[ing] to patients in a professional manner." (Performance Evaluation, Ex. K, at 207.)

The attendance log makes clear that Albright arrived to work late sixty times over the course of two years. (Attendance Log, Ex. G.) There is no evidence that a reasonable accommodation would enable him to fulfill the essential functions of his job. Albright argues that "simply changing his start time greater than thirty minutes would have addressed Plaintiff's inability" to show up on time. (Pl.'s Resp. Opp'n Mot. Summ. J. ("Pl.'s Resp."), ECF No. 23, at 14.) The record evidence refutes this. Albright's attendance log documents scattered, unpredictable and unscheduled late arrivals between 8:31 AM and 11:36 AM. *See* (Attendance Log, Ex. G.) And again, Albright never asked to begin work at any specific time after 8:30 AM. (Albright Dep. 148:11–18.) Even if he had requested a later start time, there is no reasonable alternative that would have "addressed" Albright's inability to get to work on time because his tardiness was excessive, unpredictable and unforeseeable. Albright is unable to establish his *prima facie* case for intentional discrimination under the ADA, PHRA and PFPO

because he fails to establish that he is qualified to perform the essential functions of the job, with or without a reasonable accommodation. Because Albright fails at the second prong, the Court need not analyze the third prong of the *prima facie* case.

4

Even if Albright could establish a *prima facie* case of discrimination, the University has offered a legitimate, nondiscriminatory reason for his termination. The University's burden is "relatively light" and its explanation for firing Albright must simply "permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763. Here, as explained in depositions and documentary evidence—including Albright's December 6, 2017 termination letter—the University fired him for arriving late to work and for failing to adhere to the 7:00 AM call-out policy. *See* (Termination Letter, Ex. C, P-17). This reason is enough to satisfy the Defendants' "relatively light" burden and shift the burden back to Albright to prove that Defendants' reason was merely pretextual. *See McDonnell Douglas*, 411 U.S. at 804.

To demonstrate pretext, Albright must present "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate evidence; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. To satisfy the first prong, Albright cannot simply show that the decision was wrong or mistaken; rather, he must demonstrate weaknesses, implausibilities, inconsistencies or contradictions in the employer's proffered legitimate reasons such that a reasonable factfinder could rationally find them unworthy of credence and hence

infer that the employer was not actually motivated by the nondiscriminatory reason. *Id.* at 765. To satisfy the second prong, Albright must point to evidence with sufficient probative force for a factfinder to conclude that the discriminatory reason was more likely than not the reason for the adverse employment action. *Id.*

There is no record evidence from which a reasonable jury could find that Defendants' stated reasons for Albright's termination—that he was chronically late to work and failed to inform Davis in advance—were pretext for illegal discrimination. Albright first points to four years of positive performance evaluations in attempt to inject inconsistencies into the record. However, the record evidence is consistent and uncontradicted: Albright arrived to work late without informing his supervisor sixty times in a two-year period, and this chronic tardiness was the documented reason for every written warning and ultimately, his termination.

Albright also contends that the 7:00 AM call-out policy was an unwritten, arbitrary requirement that should suggest pretext. (Pl.'s Resp. 20–21.) Even if the call-out policy were unwritten for much of his employment, Albright concedes that he was aware of the policy and that it applied uniformly to all employees in the audiology department. (Pl.'s Resp. 20; Sept. 26, 2017 Email, Ex. I.) Albright has produced no evidence that would allow a reasonable factfinder to discredit Defendants' course of action or find that a discriminatory animus was more likely than not a motivating factor for Albright's firing.

B

An employee bringing an ADA failure to accommodate claim must establish: (1) the employer knew of the employee's disability; (2) the employee asked for an

16

accommodation; (3) the employer failed to make a good-faith effort to accommodate the employee; and (4) a reasonable accommodation was possible. *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (citing *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)). Albright claims that Defendants failed to accommodate his disability after his initial start-time modification proved inadequate. (Pl.'s Resp. 16.)

1

Reasonable accommodations claims require proof that the employer knew of the employee's disability. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999). There is no precise method by which an employee must inform the employer; rather, "[w]hat matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Id.* Employers are not expected to assume that employees struggling to perform their jobs are disabled and need accommodations. *Id.* "[N]either the law nor common sense can demand clairvoyance of an employer." *Conneen*, 334 F.3d at 331.

Albright argues that Davis had knowledge of his disability, evidenced by her words and actions. (Pl.'s Resp. 15–16.) Davis admits to recognizing a change in Albright's behavior, which caused her concern for what might be happening in Albright's life. (Davis Dep. 117:2–20.) She encouraged him to seek help from the Employee Assistance Program. (*Id.* 97:3–6.) Davis also noticed that Albright developed

an "odd shakiness" and had fallen asleep during shifts, leading her to speculate about whether he might have a drug or alcohol issue. (*Id*. 118:21–119: 8.)

Albright never told Davis that he suffered from depression anxiety disorder, but he testified that he told her about feeling stressed and having suicidal thoughts. (Albright Dep. 111:16–24.) But in text message exchanges between the two, Albright blamed his tardiness on, among other things, traffic jams, public transportation delays, "a [viral] bug," "an issue of me being sick" and "mental hijacking." (Albright-Davis Text Messages, Ex. F, at 162, 179.) According to Davis, she asked Albright multiple times if he had a medical issue precluding him from getting to work on time, and he always answered "no." (Davis Dep. 54:7–15; *see* Albright Dep. 111:14–17.)

As stated by the Third Circuit in *Taylor*, "[e]mployers cannot assume employees are disabled." 184 F.3d at 313. Here, Albright denied having a medical issue and provided no documentation of a disorder, and there is no support for his contention that Davis or the University knew that he suffered from depression or anxiety. But even if Albright were correct that a trier of fact could impute notice on Davis or the University, he still fails to establish his *prima facie* case because no reasonable accommodation was possible.

## 2

The second and third elements of a *prima facie* claim require Albright to establish that he requested an accommodation and the employer failed to make a good-faith effort to accommodate. *Capps*, 847 F.3d at 157 (citing *Armstrong*, 438 F.3d at 246). The only specific accommodations that Albright requested were the 8:30 AM start time and removal from the Radnor location. Both requests were granted. And

assuming that Albright's application for intermittent FMLA leave also constituted a request for an accommodation, the University approved his FMLA application and granted him leave on September 26, 2017—the only time he sought to use it. *See Capps*, 847 F.3d at 157 (considering, for the sake of argument, that requests for intermittent FMLA leave could be an ADA request for accommodation).

There is no evidence in the record that Albright requested additional accommodations, and even if he had, he has not shown that any further accommodations would be reasonable or would allow him to perform the essential functions of his job. *See Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 234 (3d Cir. 2000) ("[T]he plaintiff in a disability discrimination case who claims that the defendant engaged in discrimination by failing to make a reasonable accommodation cannot recover without showing that a reasonable accommodation was possible.")

3

Albright has not identified any reasonable accommodations that would allow him to perform the essential functions of his job—that is, arriving to work predictably and punctually in order to see scheduled patients. He claims there are several reasonable accommodations could have been discovered and implemented, (Pl.'s Resp. 16–17): (1) Albright could schedule his audiology patients in the clinic after closing hours without the presence of support staff, or support staff could be hired to work later into the evening; (2) Albright could begin his shifts two hours later at 10:00 AM or 10:30 AM; or (3) Albright could have one morning each week reserved for administrative time. *See* (Pl.'s Resp. 16 (citing to SOF ¶¶ 5.2–5.8)).

"The ADA does not require an employer to create a new position in order to accommodate an employee with a disability." *Buskirk v. Apollo Metals*, 307 F.3d 160, 169 (3d Cir. 2002). The argument that Albright's schedule could be shifted to noon until 8:00 PM has the effect of creating a new position, because this time slot was not previously available. The two audiologists who were scheduled until 7:00 PM only worked four days per week, from 7:00 AM to 7:00 PM. (Davis Dep. 84:21–85:23; Oct. 10, 2019 Hr'g Tr. 100:4–12.) Clearly, the twelve-hour shift would not accommodate Albright because his disability would prevent him from arriving to work by 7:00 AM. *See generally* (Attendance Log, Ex. G). Albright is essentially asking the University to create a non-existent shift schedule for him, which the ADA does not require an employer to do. Albright's other suggestion that support staff could be scheduled to work a later shift in order to accommodate his evening patients would also require the University to establish a new position, (Davis Dep. 157:6–21), so this argument similarly fails.

Albright's second and third proposed accommodations—pushing back his start time by two hours or reserving one of his mornings for administrative time—would not enable him to perform the essential functions of job. Albright's attendance record indicates that he sometimes arrived to work after 10:30 AM, so a new start time would not ameliorate the issue of his sporadic and unpredictable tardiness. *See* (Attendance Log, Ex. G). And adding administrative time to his morning schedule once per week would have no effect on the other four days of the week. (*Id.*)

Albright also alleges that Defendants retaliated against him in violation of the ADA, PHRA and PFPO.[4]  To establish a *prima facie* case of retaliation, Albright must show: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action.  *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001).  If Albright establishes his *prima facie* case, the burdens shifts to the Defendants "'to advance a legitimate, non-retaliatory reason' for [their] conduct, and, if [they] do so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'"  *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).

Albright has established the first two prongs of the retaliation claim: his requests for an 8:30 AM start time and removal from the Radnor location constitute protected activity, and his termination is an adverse employment action.  For the third element of the *prima facie* case, Albright must show that his engaging in protected activity caused his termination.  Close temporal proximity "between the protected activity and the termination is [itself] sufficient to establish a causal link." *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir. 1997).  When the temporal proximity is not "unusually suggestive," the Court must look to the evidence as a whole to determine if

---

[4] The Court applies the same analysis to Albright's ADA and PHRA retaliation claims.  *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).  The ADA and PFPO claims also are analyzed in the same way.  *See Ahern v. Eresearch Tech., Inc.*, 183 F. Supp. 3d 663 (E.D. Pa. 2016).

it raises a sufficient inference of causation. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). The type of evidence a plaintiff may proffer includes: "intervening antagonism or retaliatory animus, inconsistences in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.* at 232–33 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279–80 (3d Cir. 2000)).

From the outset, Albright fails to show an "unusually suggestive" temporal proximity between his request for accommodations and his termination. Albright asked for accommodations in the fall of 2016 and was terminated more than a year later on December 6, 2017. *See Williams*, 380 F.3d at 760 (holding two-month gap between request for accommodations and termination is not unusually suggestive). Thus, for Albright to establish causation, he must point to other evidence in the record. He suggests that Davis's implementation of the performance improvement plan after months of informal counseling should constitute a pattern of antagonism. (Oct. 10, 2019, Hr'g Tr. 82:9–14.) Yet he points to no case law in support of this argument, and the Court can find none. Nothing else in the record suggests antagonism or a retaliatory animus. On the contrary, Albright called his relationship with Davis "fine. It was like any other audiologist relationship. Everybody is cordial. We had no problems with one another. There was no animosity." (Albright Dep. 54:4–10.) Neither has Albright demonstrated inconsistencies in the Defendants' reasons for disciplining and terminating him. At each step in the disciplinary process, Davis cited Albright's unannounced and unexcused tardiness as the rationale for issuing written warnings and terminating him. *See* (Coaching, Ex C., P-7; First Written Warning, Ex.

C, P-9; Second Written Warning, Ex. C, P-12; Final Written Warning, Ex. C, P-14). No

reasonable factfinder could determine that Albright was fired in December of 2017 in

retaliation for requesting and being granted an accommodation in the fall of 2016.[5]

V

FMLA claims are commonly brought under a theory of either interference or

retaliation. *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005). An

FMLA interference claim arises under 29 U.S.C. § 2615(a)(1), which makes it "unlawful

for any employer to interfere with, restrain, or deny the exercise of or the attempt to

exercise, any right provided under" the FMLA. An FMLA retaliation claim arises

under 29 U.S.C. § 2615(a)(2), which makes it "unlawful for any employer to discharge or

in any other manner discriminate against any individual for opposing any practice

made unlawful" by the FMLA.

A

For Albright to succeed on his interference claim, he must establish that: (1) he

was an eligible employee under the FMLA; (2) the University was an employer subject

to the FMLA's requirements; (3) Albright was entitled to FMLA leave; (4) Albright gave

notice to the defendant of his intention to take FMLA leave; and (5) Albright was

denied the benefits to which he was entitled under the FMLA. *Ross v. Gihuly*, 755 F.3d

185, 191–92 (3d Cir. 2014). "An interference action is not about discrimination, it is

only about whether the employer provided the employee with the entitlements

---

[5]     Even if Albright could establish a *prima facie* case of ADA retaliation, Defendants have
satisfied their burden of articulating a legitimate, nondiscriminatory reason for the adverse
employment action: Albright's repeated inability to get to work on time and his failure to notify
Davis in advance. Albright cites to nothing in the record that would allow a reasonable jury to
conclude that Defendants' rationale was pretextual. *See supra* subsection III.A.4.

guaranteed by the FMLA." *Callison*, 430 F.3d at 119–20. Accordingly, FMLA interference claims do not involve a *McDonnell Douglas* burden-shifting analysis. *Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006).

The parties only dispute the fifth prong—whether Albright was denied any benefit to which he was entitled under the FMLA. "In order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007). A plaintiff must show that "FMLA benefits were actually withheld." *Ross*, 755 F.3d at 192.

Albright advances two theories for how his FMLA benefits were withheld: First, he claims that his termination cut off his FMLA benefits. (Pl.'s Resp. 23.) Second, he contends that the department's 7:00 AM call-out procedure was an arbitrary rule that prevented him from access to his FMLA benefits. (*Id.*)

With respect to the termination theory, the FMLA "does not provide employees with a right against termination for a reason other than interference with rights under the FMLA." *Sarnowski*, 510 F.3d at 403. Defendants, therefore, can defeat Albright's claim if they can demonstrate that Albright's termination was for a reason unrelated to his intention to exercise his FMLA rights. *Id.* Defendants meet their burden here. On November 29, 2017, Albright arrived to work at 11:28 AM without attempting to invoke his FMLA leave either before or after he arrived for work. (Attendance Log, Ex. G, at 190; Albright Dep. 126:3–8; Nov. 29, 2017 Email, Ex. J, at 203, ECF No. 20-3.) The University fired Albright for his last in a very long line of unexcused tardiness, not for attempting to invoke FMLA leave. *See Ross*, 755 F.3d at 192 ("[B]ecause [plaintiff did]

not allege that [defendant] withheld any entitlement guaranteed by FMLA, he fails to state a claim for interference.").

Albright's second argument—that the 7:00 AM call-out policy interfered with his right to invoke FMLA leave—also fails. "Internal sick leave policies or any collective bargaining agreements are only invalidated to the extent they diminish the rights created by the FMLA." *Callison*, 430 F.3d at 121; *see also Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 161 (2d Cir. 2011) ("[A] company may discipline an employee for violating its internal leave policy as long as that policy is consistent with the law . . . .").

When FMLA leave is intermittent and unforeseeable, the employee must give "such notice as is practicable." 29 U.S.C. § 2612(e)(2)(B). "It generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable to such leave." 29 C.F.R. § 825.303(a). If there are unusual circumstances justifying the employee's failure to comply, however, the leave policy may not be consistent with the FMLA. *Id.* § 825.303(c). An unusual circumstance may exist where "the medical condition or illness prevents compliance" with internal company procedures. *Int'l Bhd. of Elec. Workers Local 1600 v. PPL Elec. Utils. Corp.,* 2017 WL 6547138, at *8 (E.D. Pa. Dec. 22, 2017). Arguably, the 7:00 AM call-out policy could be inconsistent with Albright's rights under the FMLA because his disability allegedly inhibited his ability to respond to external stimuli in order to wake up on time. This would create the unusual situation whereby Albright could not physically comply with the department's 7:00 AM call-out deadline.

Even if the 7:00 AM call-out procedure violated Albright's FMLA-protected rights, his claim still fails because the University never withheld FMLA benefits from Albright. On September 26, 2017, when Albright first attempted to invoke FMLA leave but failed to comply with the 7:00 AM call-out procedure, the University still granted him FMLA leave retroactively. Then, when Albright arrived late to work on November 29, 2017, he did not attempt to invoke FMLA that day, either before or after his late arrival. The 7:00 AM call-out procedure therefore never actually interfered with Albright's FMLA leave. In neither of these situations were "FMLA benefits . . . actually withheld." *Ross*, 755 F.3d at 192.

B

Albright's FMLA retaliation claim requires proof of Defendants' retaliatory intent and is therefore analyzed using the *McDonnell Douglas* burden-shifting framework. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012). To establish a *prima facie* case, Albright must show that (1) he invoked his right to FMLA leave; (2) he suffered an adverse employment decision; and (3) the adverse employment decision was causally related to his termination. *Id.* at 301–02. The parties only dispute the third element of the *prima facie* claim. (Defs.' Mem. 17; Pl.'s Resp. 19.)

The Third Circuit has articulated two relevant factors for establishing whether a causal link exists between the invocation of FMLA leave and the adverse employment decision: (1) a showing that the two events were close in time, or (2) evidence of ongoing antagonism toward the employee. *See Abramson*, 260 F.3d at 288. The question of timing focuses on the "temporal proximity between the protected activity and the

termination." *Williams*, 380 F.3d at 760 (internal citations and quotation marks omitted). "[T]he timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Id.* (internal citations and quotation marks omitted).

Albright first used FMLA leave on September 26, 2017 and he was fired on December 6, 2017—two months and ten days later. The Third Circuit has established no bright-line rule for a time frame indicative of unusually suggestive temporal proximity, and the Circuit has been "reluctant to infer a causal connection based on temporal proximity alone." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014). *See e.g.*, *Williams*, 380 F.3d at 761 (finding two-month gap in ADA retaliation case not unusually suggestive); *LeBoon*, 503 F.3d at 233 (finding three-month gap in Title VII retaliation case not unusually suggestive). *But see Lichtenstein*, 691 F.3d at 307 (finding seven-day gap in a FMLA retaliation case unusually suggestive). When temporal proximity is not enough to be unusually suggestive on its own, the Court considers whether the "proffered evidence, looked at as a whole" raises the inference of causation. *LeBoon*, 503 F.3d at 232 (internal citation and quotation marks omitted).

In the absence of an unusually suggestive temporal proximity, Albright must show that Davis "engaged in a pattern of antagonism in the intervening period." *Woodson*, 109 F.3d at 920–21. Also relevant to the causation analysis is whether employment concerns were documented before the protected activity took place. *LeBoon*, 503 F3d at 232–34.

Nothing in the record supports a finding of antagonism toward Albright.  Again, Albright described his relationship with Davis as "fine," "cordial," and with "no problems" and "no animosity."  (Albright Dep. 54:4–10.)  Additionally, the fact that Albright had already gone through the formal disciplinary process before invoking FMLA undercuts his causation argument.  Without the temporal proximity or a pattern of antagonism toward Albright, he fails to establish a *prima facie* case of retaliation.  Even if he could, for the reasons discussed above in subsection III.A.4, Defendants have articulated a legitimate, nondiscriminatory reason for his termination, and Albright is not able to prove pretext.

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.